869 F.2d 1491
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Michael KARLSKIN, Plaintiff-Appellant,
v.
Otis R. BOWEN, M.D., Secretary of Health and Human Services,
Defendant-Appellee
 No. 88-1237.
 United States Court of Appeals, Sixth Circuit.
 Feb. 9, 1989.
 
 Before MERRITT and MILBURN, Circuit Judges, and LIVELY, Senior Circuit Judge.
 MERRITT, Circuit Judge.
 
 
 1
 The primary issue in this Social Security case is whether substantial evidence supports the Secretary's finding that the claimant, Michael Karlskin, was not disabled because he has the residual functional capacity to perform a significant number of sedentary jobs with a sit/stand option that exist in the national economy. Because we believe that substantial evidence supports the decision, we affirm the holding of the District Court.
 
 I.
 
 2
 On February 28, 1986, Michael Karlskin filed a claim for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. Secs. 416(i) and 423. The Social Security Administration denied his application initially and upon reconsideration. Karlskin requested a hearing; and one was held on October 6, 1986, in which Karlskin appeared with counsel and testified. A vocational expert, Donald Heckler, also testified. On October 21, 1986, the Administrative Law Judge found that Karlskin had the residual functional capacity to perform a significant number of sedentary jobs with a sit/stand option that exist in the national economy. The Appeals Council denied Karlskin's request for review on May 28, 1987, making the ALJ's decision the final decision of the Secretary.
 
 
 3
 On February 22, 1988, the District Court found there was substantial evidence to support the Secretary's decision that Karlskin could perform a significant number of jobs in the national economy. Karlskin timely filed this appeal.
 
 II.
 A. Claimant's background
 
 4
 Karlskin was twenty-nine years old at the time he applied for disability benefits and has a high school education. He alleges that he became unable to work on June 23, 1984, due to a lower back injury. His insured status expired on June 30, 1987.
 
 
 5
 Karlskin last worked as a solder dipper, a job requiring him to lift and carry boxes that weighed approximately ninety pounds. Prior to that time he was a press operator, a job that was performed entirely in a seated position. Karlskin also worked as a security guard and a truck driver. He still is able to drive a car, to take out the garbage, to vacuum and to mow the lawn with a power mower for up to ten minutes at a time.
 
 B. Medical evidence
 
 6
 Prior to Karlskin's alleged June 23, 1984 onset date of disability, medical examinations revealed normal to mildly abnormal findings. In August, 1983, the lumbar x-rays showed "mild" interspace narrowing at L4-5 and L5-S1 and "minimal" osteophytosis at L3-4. On October 10, 1983, Dr. Vorenkamp, an orthopedic surgeon, reported that Karlskin complained of pain in his back and posterior thighs and numbness that radiated from his posterior thighs to his heels. The x-rays of the lumbosacral spine showed "mild" degenerative changes of the facet joints but revealed that the posterior elements of the lumbar vertebral segments were well demonstrated and were within normal limits. Karlskin's neurological exam was normal and he had normal strength, sensation, reflexes and pulses. Dr. Vorenkamp diagnosed low back pain and prescribed physical therapy and pain medication. On October 17, 1983, Dr. Vorenkamp released Karlskin back to work.
 
 
 7
 Dr. Vorenkamp saw Karlskin several times during the next eight months. The doctor noted that Karlskin was experiencing some numbness but later in the year stated that he was not experiencing pain and had a good range of back motion.
 
 
 8
 Karlskin was also treated at Northern Michigan Hospital in March and in April of 1984. He complained of back pain on both occasions and received a steroid injection.
 
 
 9
 Although June 23, 1984, is the alleged date of disability, a lumbar CT scan performed the following month showed only "very minimal annulus bulging and 'mild' disc herniation at L-4". (J.A. 102). Between October, 1984, and February, 1985, there is no medical documentation. On March 12, 1985, Dr. Vorenkamp reported that Karlskin complained of stiffness and aching, as well as numbness in the right foot. He was treated with Valium and Tylenol # 3. Again, in May, 1985, Karlskin complained of pain that radiated from his lower back to his right buttock and right leg, but the doctor noted his reflexes were normal. The next day Karlskin underwent a lumbar myelogram. The test suggested anterior and left lateral disc herniation involving the L4-L5 interspace and nerve root edema of the L5 nerve root on the left.
 
 
 10
 On May 17, 1985, Dr. Cilluffo, a neurosurgeon, reviewed the myelogram and examined Karlskin. The doctor stated that although the myelogram suggested nerve root compression on the left side, Karlskin complained of leg pain only in his right side. Additionally, straight leg raising was negative, and Karlskin's strength was normal.
 
 
 11
 On March 24, 1986, Dr. Vorenkamp reported that Karlskin had normal reflexes, strength and range of motion in the lumbar spine. Dr. Vorenkamp referred Karlskin to a pain clinic because of his continued complaints of pain. In April of 1986, Dr. Vorenkamp's office reported to a Disability Determination Services employee that although Karlskin continued to complain of back and leg pain and headaches, he had normal reflexes and strength. His straight leg raising was negative, and there was no paravertebral muscle spasm.
 
 C. Vocational Testimony
 
 12
 In response to the ALJ's hypothetical question that assumed the residual functional capacity to perform sedentary work with a sit/stand option, as well as Karlskin's age, education, training and background, Dr. Heckler, the vocational expert, testified that there was a significant number of entry level sedentary jobs with a sit/stand option that Karlskin could perform. Among the jobs identified by Dr. Heckler were those of an attendant in a self-service gas station or parking lot and industrial jobs requiring inspecting, machine attending, assembling or packaging work. He testified that there were 10,000 industrial jobs and 2,500 attendant jobs in the lower peninsula of Michigan that Karlskin could perform.
 
 D. The ALJ's Decision
 
 13
 The ALJ found that Karlskin had a back impairment dating from October 1983. Based on a diagnosis of a herniated disc at L4-L5 on the left side, the ALJ found that the claimant could not perform his past relevant work or work requiring heavy lifting and long periods of standing, walking or sitting. Although the ALJ found that Karlskin had a severe impairment, the ALJ determined that Karlskin did not have an impairment or combination of impairments that meets or equals a listed impairment. The ALJ found an inconsistency between Karlskin's complaints of disabling pain and the objective medical evidence. The ALJ also found that although Karlskin's residual functional capacity for the full range of sedentary work was reduced by his inability to sit for long, sustained periods of time, there were a significant number of jobs in the national economy that he could perform with a sit/stand option.
 
 E. The District Court Decision
 
 14
 Karlskin wanted the District Court to consider another physician's findings of July 27, 1987, in spite of the fact that Karlskin's insured status expired on June 30, 1987. Karlskin did not submit this medical report to either the ALJ or to the Appeals Council. The District Court correctly refused to consider this extra-record evidence. The report is not a part of the administrative record and cannot properly be considered by this Court either. See Parks v. Harris, 614 F.2d 83 (5th Cir.1980).
 
 III.
 
 15
 The scope of review in this case is governed by Richard v. Perales, 402 U.S. 387, 401 (1971) (substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Karlskin relies on Wages v. Secretary of Health and Human Services, 755 F.2d 495 (6th Cir.1985), for the proposition that alternating between sitting and standing precludes him from doing sedentary work. He also complains that the vocational expert's testimony was cursory and labels the expert's testimony as "nonsubstantial." Finally, he argues that the ALJ did not evaluate properly his complaints of pain.
 
 
 16
 Karlskin's complaints of severe disabling pain are not supported by the medical evidence as found by both the ALJ and the District Court. Consequently, Karlskin does not satisfy the two-pronged analysis for complaints of disabling pain set forth in Duncan v. Secretary of Health and Human Services, 801 F.2d 847 (6th Cir.1986). This Circuit has looked at conditions such as muscle spasm, muscle atrophy and neurological deficits for the purpose of determining the presence of disabling pain. See Mullen v. Bowen, 800 F.2d 535, 548 (6th Cir.1986). In Karlskin's case there is no evidence of muscle atrophy, and Dr. Cilluffo specifically stated that Karlskin was "neurologically normal". Although muscle spasm was reported once prior to Karlskin's alleged onset date, by April, 1986, Dr. Vorenkamp reported no muscle spasms. Consequently, Karlskin's subjective complaints of severe disabling pain are unsupported by objective clinical findings and are not fully credible. The Secretary's findings are supported by substantial evidence on the record as a whole. Maziarz v. Secretary of Health and Human Services, 837 F.2d 240, 244 (6th Cir.1987).
 
 
 17
 The Secretary properly determined that Karlskin could perform a significant number of jobs that exist in the national economy. Karlskin's reliance on Wages, supra, is misplaced. In that case, the claimant had the residual function capacity to perform sedentary work with a sit/stand option, and the ALJ used the Medical Vocational Guidelines to direct a finding of not disabled. This Court found that the ALJ in Wages should have relied on vocational expert testimony. Wages, 755 F.2d at 498-99. However, in Karlskin's case, the ALJ did not rely on the Medical-Vocational Guidelines. He properly relied on the vocational expert's testimony to determine that there were 12,500 entry level jobs that exist which Karlskin could perform.
 
 
 18
 For the foregoing reasons, we affirm the decision of the District Court.